648 So.2d 145 (1994)
AMJAD MUNIM, M.D., P.A., Appellant/Cross-Appellee,
v.
George AZAR, M.D., Appellee/Cross-Appellant.
PULMONARY AND CRITICAL CARE ASSOCIATES OF FT. LAUDERDALE P.A., Appellant,
v.
George AZAR, M.D., Appellee.
Nos. 92-3324, 93-1898.
District Court of Appeal of Florida, Fourth District.
August 24, 1994.
Rehearing and Rehearing Denied February 2, 1995.
*147 Nancy W. Gregoire and Terrence Russell of Ruden, Barnett, McClosky, Smith, Schuster *148 & Russell, P.A., Fort Lauderdale, for appellant/cross-appellee and appellant.
Daniel S. Pearson, Tracy Nichols and Lucinda A. Hofmann of Holland & Knight, Miami, for appellee/cross-appellant and appellee.
Rehearing and Rehearing En Banc Denied February 2, 1995.
PARIENTE, Judge.
These related appeals, which we have sua sponte consolidated, arise from the breakup of a professional employment relationship between the employee, George Azar, M.D. (Dr. Azar), and his employer, Amjad Munim, M.D., P.A. (Munim, P.A.). Because the trial court's findings that Munim, P.A. breached the contract and the trial court's damage calculations are supported by substantial competent evidence, we affirm the judgment in favor of Dr. Azar for $288,455.67. On the cross-appeal, we agree with Dr. Azar that damages for the third year of his contract should have been included in the final judgment because the trial court found that Munim, P.A. breached the contract by wrongfully terminating Dr. Azar.
The second aspect of this appeal involves post-judgment proceedings by Dr. Azar to collect on his judgment. We affirm the trial court's summary judgment order holding that Pulmonary and Critical Care Associates of Ft. Lauderdale, P.A. (Pulmonary Associates), formed by Dr. Munim twelve days after the entry of the breach of contract judgment, was liable for the judgment.

BACKGROUND OF INITIAL LAWSUIT
This saga began in 1988 with the hiring of Dr. Azar by Munim, P.A. under a three-year contract. Dr. Munim was the sole shareholder of Munim, P.A. Sixteen days before the end of the second year, Dr. Munim terminated Dr. Azar. While the parties agree that they entered into an employment contract and that subsequently their business and personal relationship deteriorated, their explanations of the events surrounding the decline differ considerably. Dr. Munim contended that the termination was justified by Dr. Azar's behavior which he characterized as argumentative, undiplomatic and less than satisfactory from a medical standpoint; Dr. Azar countered that his termination was a consequence of Dr. Munim's greed and his overbearing and unsupportive behavior. After termination by Munim, P.A., Dr. Azar began his own medical practice. Munim, P.A. instituted a lawsuit for breach of a restrictive covenant in the employment contract. Dr. Azar counterclaimed seeking damages for breach of the employment relationship.

STANDARD OF REVIEW
During a one-day temporary injunction hearing and a three-day non-jury trial, the trial court observed the demeanor of both physicians, heard all of the evidence and weighed the credibility of the various witnesses. It found that "the facts overwhelmingly show that Munim, P.A. breached the contract" when Dr. Munim fired Dr. Azar just sixteen days before Dr. Azar would have been entitled to a sizeable second year bonus. The trial court found that the termination resulted from Dr. Munim's "consistent pattern of greed" culminating in his unwillingness to pay Dr. Azar the substantial bonus that was to become due at the end of the second year. It rejected Dr. Munim's explanation that Dr. Azar's termination was a result of "shoddy care, poor bedside manner and antagonistic attitude."
The standard of review we must utilize is whether there is substantial, competent evidence to support the verdict. Antonelli v. Neumann, 537 So.2d 1027 (Fla. 3d DCA 1988). In Punkar v. King Plastic Corp., 290 So.2d 505, 507 (Fla. 2d DCA), cert. denied, 297 So.2d 30 (Fla. 1974), the court articulated the standard of review in an employment relationship:
[W]hether an employee has breached the terms of his employment contract in such a substantial degree as to justify his discharge is generally a question of fact to be decided by the jury if the pertinent evidence on this issue could lead the minds of reasonable men to conflicting conclusions.
In a non-jury trial, the trial court's function is to evaluate the witnesses and weigh the testimony and other evidence to arrive at findings of fact. Puritz v. Rosen, 442 So.2d 278, 280 (Fla. 4th DCA 1983). When reviewing the facts, the appellate court must disregard *149 conflicting evidence and accept the facts in evidence which are most favorable to the party who prevailed below. Blue Lakes Apts. Ltd. v. George Gowing, Inc., 464 So.2d 705, 708 (Fla. 4th DCA 1985); Anastasio v. Summersett, 217 So.2d 854 (Fla. 4th DCA 1969).

WRONGFUL TERMINATION
The basic issues for the trial court to decide were whether Dr. Munim violated the terms of the contract when he terminated Dr. Azar and if wrongfully terminated, what amount was owed to Dr. Azar under the contract. Dr. Munim argues that the trial court erroneously construed the contract which he claims gave him sole and absolute discretion to terminate Dr. Azar if his services were not performed to Dr. Munim's satisfaction. The contract, however, by its terms, limits the employer to exercising "reasonable" discretion in terminating an employee for specified violations. To be terminated for violations of rules, policies or directives, the employee would have to be "advised prior to such failure." The trial court found that Dr. Munim's actions in firing Dr. Azar were not reasonable; the reasons advanced by Dr. Munim were pretextual; Dr. Azar violated no known office policy; and Dr. Munim acted purely out of economic and mercenary reasons. These findings are supported by substantial, competent evidence, including a reasonable reading of the employment contract and the specified grounds for termination.

CONTRACT AMBIGUITY CONCERNING BONUSES
Dr. Munim also argues on appeal that the trial court erroneously construed the contract concerning the method of bonus compensation and that this erroneous interpretation influenced the trial court in finding that Dr. Munim intentionally underpaid Dr. Azar during his employment and in erroneously calculating the amount of damages. The compensation provision regarding bonuses provided that the employee would receive a percentage of the "gross income of the Employer derived from medical services rendered with respect to the medical practice of the employer and actually received during the ... fiscal year... ." The clause clearly specifies that the gross income must actually be received during the bonus year. The ambiguity focused on whether the bonus included a percentage of all gross revenues from medical services received during the year regardless of when the services were performed.
The parties offered testimony and differing interpretations, which highlighted the ambiguity of this clause. Dr. Munim argued that the provision required the medical services be performed and payment be received in the same fiscal year. Dr. Azar argued that pursuant to accepted cash method principles of accounting, the clause should logically be interpreted to compensate him for a percentage of the gross income from medical services received during the fiscal year, excluding only gross income from nonmedical services. Under Dr. Munim's interpretation, if Dr. Azar performed services in the first year and payment was not received until the second year, Dr. Azar would never receive a bonus for such services.
The trial court rejected Dr. Munim's restrictive interpretation. It also additionally relied on language in the contract which referred to "generally accepted accounting principles." This phrase provided further support for a bonus calculation based on a cash method of accounting versus the hybrid method urged by Dr. Munim. We find the trial court's interpretation of an ambiguous clause, drafted by Dr. Munim's attorneys, to be reasonable and we uphold the trial court's interpretation as not being clearly erroneous. See State Farm Fire and Cas. Co. v. De Londono, 511 So.2d 604, 605 (Fla. 3rd DCA), rev. dismissed, 519 So.2d 988 (Fla. 1987); Howard v. Howard, 467 So.2d 768, 770 (Fla. 1st DCA 1985).

THIRD YEAR CONTRACTUAL DAMAGES
While we agree with the trial court's method of determining damages, we disagree with the trial court's failure to award damages for the third year of the contract. After finding that Dr. Munim breached the contract by wrongful termination and underpayment, the trial court concluded that because *150 the contract terminated prior to the beginning of the fiscal year, the contract no longer existed and thus precluded contractual damages for the third year. The trial court, however, found a breach of contract by Dr. Munim, not a termination by mutual assent. The well-established and long-standing measure of damages for breach of contract entitles the employee to the contract price for the unexpired term, less the amount the employee actually earned or with reasonable diligence might have earned during this same period. See Hazen v. Cobb, 96 Fla. 151, 117 So. 853, 859 (1928); Zayre Corp. v. Creech, 497 So.2d 706, 708 (Fla. 4th DCA 1986); Juvenile Diabetes Research Found. v. Rievman, 370 So.2d 33 (Fla. 3d DCA 1979); Punkar. This would allow Dr. Azar to recover damages for the third year based on the contract.
Although Dr. Munim argues on appeal that the contract was mutually terminated, neither side presented evidence of, or argued, mutual termination below. The trial court made no finding on this issue. The only issue before the court, as reflected in the court's order, was which party breached the contract. The argument of mutual termination cannot be raised for the first time on appeal. See Radiation, Inc. v. Campbell, 200 So.2d 192, 193 (Fla. 4th DCA 1967). Accordingly this cause will be remanded for the trial court to determine the appropriate amount of damages for the third year based on the evidence in the record.[1]

POST-JUDGMENT PROCEEDINGS
In the second part of this appeal, we must decide the propriety of the trial court's summary judgment order against Pulmonary Associates, which held Pulmonary Associates liable for the judgment against Munim, P.A. Dr. Azar implied Pulmonary Associates in proceedings supplementary, pursuant to section 56.29, Florida Statutes (1993), after learning through discovery in aid of execution that twelve days after the entry of the final judgment against Munim, P.A., Dr. Munim formed a new professional association known as Pulmonary and Critical Care Associates of Ft. Lauderdale, P.A. The new P.A. looked curiously like the old P.A., which Dr. Azar claimed was "gutted." The legal theories advanced for imposing liability on Pulmonary Associates were based on intertwined but distinct concepts: fraudulent transfer of assets, de facto merger and/or mere continuation of business.
Pursuant to section 56.29, judgment creditors have a "useful, efficacious and salutary remedy" to subject assets to "a speedy and direct proceeding in the same court in which the judgment was recovered." Regent Bank v. Woodcox, 636 So.2d 885 (Fla. 4th DCA, 1994); Allied Indus. Int'l, Inc. v. AGFA-GEVAERT, Inc., 688 F. Supp. 1516, 1517 (S.D.Fla. 1988), aff'd, 900 F.2d 264 (11th Cir.1990). Proceedings supplementary are equitable in nature and should be liberally construed. Ferguson v. State Exchange Bank, 264 So.2d 867 (Fla. 1st DCA 1972). Under section 56.29(5) a court may fashion an appropriate equitable remedy to afford a judgment creditor as complete relief as possible including finding a new corporation liable for a judgment against its predecessor corporation when the new corporation is merely the alter ego of the predecessor corporation. Allied, 688 F. Supp. at 1519 and cases cited therein.
Summary judgment is appropriate in proceedings supplementary where no genuine issue of material fact exists. See Continental Cigar Corp. v. Edelman & Co., Inc., 397 So.2d 957 (Fla. 3d DCA), rev. denied, 411 So.2d 381 (Fla. 1981). The uncontroverted material facts upon which the trial court properly relied established the following. Pulmonary Associates was incorporated twelve days after the entry of the final judgment against Munim, P.A. Within six weeks of the entry of the final judgment Munim, P.A. stopped seeing patients and rendering medical services. Pulmonary Associates *151 commenced seeing patients and rendering medical services the very next day. Dr. Munim is the sole shareholder of Munim, P.A. and the sole shareholder of Pulmonary Associates; he is president of and controls both. Pulmonary Associates and Munim, P.A. are located in the same office. Except for newly acquired computer equipment, Pulmonary Associates has the same furniture, medical apparatus and office equipment. Nurses who worked for Munim, P.A. now work for Pulmonary Associates. The clerical staff and the office manager are the same. The medical records and patient files that were kept by Munim, P.A. were left in place for use by Pulmonary Associates. The medical practice of Pulmonary Associates is essentially identical to that of Munim, P.A.[2] Patients of Munim, P.A., whose follow-up appointments were scheduled before December 1, 1992, would be seen by Pulmonary Associates. Any payment received for services rendered after December 1, 1992 was given to Pulmonary Associates without payment to Munim, P.A. There was no interruption of Dr. Munim's business. Munim, P.A. gave Pulmonary Associates a "turn-key" medical practice.
Although all of these facts were established through the deposition of Dr. Munim, Pulmonary Associates submitted affidavits in opposition to the summary judgment motion. Dr. Munim explained through affidavit that when he testified under oath that the old P.A. ceased operations, he misspoke. He meant that only the medical services had ceased; the old P.A. was still receiving the old accounts receivable. The affidavits, as well as Dr. Munim's argument on appeal, raise a novel approach to evading collection: that because medical records and patient files have no inherent, independent value or goodwill there could be no executable asset transferred from Munim, P.A. to Pulmonary Associates.
We do not find that the belated, unsubstantiated affidavits, which attempt to contradict the sworn deposition testimony of Dr. Munim, raise a genuine issue of material fact in light of the other uncontroverted facts. See Wells v. Wilkerson, 391 So.2d 266 (Fla. 4th DCA 1980).

PENDING DISCOVERY
We reject Dr. Munim's claim that summary judgment was prematurely granted because of pending discovery. The "discovery" requests directed to Dr. Azar essentially sought to discover the factual basis for the imposition of legal liability on Pulmonary Associates. The factual basis for holding Pulmonary Associates liable, however, was established through Dr. Munim's deposition. Dr. Munim, not Dr. Azar, possessed the relevant facts and documents concerning the creation of the new P.A. and the transfer of assets from Munim, P.A. to Pulmonary Associates. Pulmonary Associates has simply failed to demonstrate how any pending discovery of Dr. Azar would produce evidence as to the legality of Dr. Munim's transfer of assets to the new corporation. Thus, we find no abuse of discretion in denying the motion for continuance of the summary judgment hearing.

THEORIES OF LIABILITY
At the outset, we recognize that Florida joins the vast majority of jurisdictions in honoring the "traditional corporate law rule" which does not automatically impose the liabilities of a predecessor corporation upon a successor corporation unless:
(1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor.
Bernard v. Kee Mfg. Co., 409 So.2d 1047, 1049 (Fla. 1982). Because no express assumption of the obligations occurred with the formation of Pulmonary Associates, our analysis must focus on the theories of fraudulent transfer, de facto merger and mere continuation of the business.

*152 FRAUDULENT TRANSFERS

Florida has long recognized the principle that a voluntary conveyance by one who is indebted is presumptively fraudulent when attacked by a judgment creditor upon a debt existing at the time of the conveyance. Bay View Estates Corp. v. Southerland, 114 Fla. 635, 154 So. 894 (1934), overruled in part on other grounds, B.A. Lott, Inc. v. Padgett, 14 So.2d 667 (Fla. 1943); United States v. Horton, 760 F.2d 1225 (11th Cir.1985). The rule enunciated in Bay View prohibits transfers made which interfere with existing rights of creditors who have just, lawful and existing claims without a showing that the debtor was actually insolvent at the time of the transfer. As stated by the supreme court in J.I. Kelley Co. v. Pollock & Bernheimer, 57 Fla. 459, 464, 49 So. 934, 935 (Fla. 1909), citing Logan v. Logan, 22 Fla. 561, 1 Am.St.Rep. 212 (Fla.):
When the legal effect of a conveyance is to hinder or delay creditors, the intent [to defraud] will be presumed, regardless of the actual motives of the parties.
See also In re F & C Servs., Inc., 44 B.R. 863, 868-69 (Bankr.S.D.Fla. 1984) and cases cited therein.
Fraudulent transfers have been prohibited by statute as early as the Statute of 13 Elizabeth enacted in 1571 in England. Florida adopted its version of the Statute of 13 Elizabeth in 1823 (former section 726.01, Florida Statutes (1823)), which was the applicable statute through 1987. Effective January 1, 1988, Florida adopted the Uniform Fraudulent Transfer Act (UFTA), in chapter 726, Florida Statutes (1988), which continues the previous statutory law and codifies common law unless expressly replaced. See § 726.111, Fla. Stat. (1988). Under the UFTA, any transfer made with "actual intent to hinder, delay or defraud" any present or future creditor is a fraudulent transfer. § 726.105(1)(a), Fla. Stat. (1993). Because of the difficulty of proving actual intent, past statutory law, existing case law and the UFTA look to indicia of intent commonly known as "badges of fraud." § 726.105(2); Cleveland Trust Co. v. Foster, 93 So.2d 112 (Fla. 1957); Russ v. Blackshear, 88 Fla. 573, 102 So. 749 (1925).
In this case, fraudulent intent may be presumed from evidence of numerous "badges of fraud" as delineated in section 726.105(2): the transfer of Munim, P.A. patient files and assets were to an insider as defined by section 726.102(7); Dr. Munim retained control of the assets after the transfer; the transfer was of substantially all of the debtor's assets; there was no consideration received for the assets; and the transfer occurred shortly after a substantial debt was incurred.
In Perrott v. Frankie, 605 So.2d 118 (Fla. 2d DCA 1992), the second district held that fraudulent intent may be inferred when a debtor transfers a substantial portion of his assets to a relative, for little or no consideration, after the debtor has been sued or threatened with suit. Likewise fraud will be presumed when the transfer occurs between two corporations controlled by the same individuals. Florida Brodgex Distrib., Inc. v. Hulsey, 103 Fla. 723, 729-30, 138 So. 728, 730 (1931):
The fraudulent nature of the transaction may be found to exist in the transfer of assets of a corporation without consideration or for grossly inadequate consideration to a successor corporation to the prejudice of creditors for the benefit of the same individuals who constitute the beneficial owners of each of the corporations involved.
Here, Dr. Munim simply transferred the assets of one P.A., in which he was the sole shareholder, to another P.A., in which he was the sole shareholder, without consideration and within days of the entry of a substantial judgment.
The elements of constructive fraud are also established based on the undisputed facts. In addition to codifying the law regarding actual fraud, the UFTA creates a statutory category of constructive fraud to protect present creditors, recognizing certain transactions as fraudulent without regard to the debtor's intent. § 726.106(1), Fla. Stat. (1993). Any transfer made is constructively fraudulent pursuant to this subsection if the debtor made the transfer while insolvent and without receiving reasonably equivalent value in exchange for the transfer or obligation. *153 Under the UFTA, a debtor is "insolvent" if the sum of his debts is greater than his assets at a fair evaluation, section 726.103(1), Florida Statutes (1993), or a debtor is presumed insolvent if generally not paying his debts as they become due, id. at section 726.103(2).
As a creditor, Dr. Azar utilized the procedure set forth in section 56.29, Florida Statutes (1993) to implead Pulmonary Associates. Pursuant to section 56.29(6), the burden is on the transferee to prove the transfer was not fraudulent. Treated Timber Products, Inc. v. S & A Assoc., 488 So.2d 159 (Fla. 1st DCA 1986). Section 56.29(6) is applicable to post-final judgment transfers. See Buchanan v. Sullivan, 620 So.2d 1301 (Fla. 4th DCA 1993).
While recognizing that summary judgments are rarely countenanced in fraud cases, the uncontradicted facts in this case point to only one logical conclusion  that the transfer was fraudulent. A creditor may prove a fraudulent conveyance by establishing a prima facie case that is unrebutted, or by demonstrating actual fraudulent intent. See Advest, Inc. v. Rader, 743 F. Supp. 851 (S.D.Fla. 1990). We find that Dr. Munim did not establish sufficient facts to rebut the presumption of fraudulent transfer.
To argue as Dr. Munim does, that the patient files and goodwill of the old P.A. lack value and therefore, could not be the subject of a fraudulent transfer, misses the point. Patients who called for a follow up appointment after November 30th received appointments with the new P.A. which then presumably received a fee for rendering these services. The question on the issue of fraudulent transfer is whether Munim, P.A. transferred its assets to Pulmonary Associates without consideration. The assets could have minimal value and still be considered a fraudulent transfer if the result harmed Dr. Azar by eliminating from the old P.A. its means of earning revenues to pay the judgment.
Dr. Munim's reliance on Thompson v. Thompson, 576 So.2d 267 (Fla. 1991) is misplaced. In Thompson, the supreme court, in the context of a divorce proceeding, concluded that a professional association's goodwill had value which could be the subject of distribution as a marital asset. As a practical matter, we note that medical practices, including valuable patient lists, are bought and sold for consideration all the time. The essence of the business of Munim, P.A. was its patients. We thus reject the argument that the medical records and patient files have no inherent value and therefore, could not be the subject of a fraudulent transfer.
It is apparent from the uncontradicted facts in this case that Dr. Munim ceased rendering medical services as Munim, P.A. and formed Pulmonary Associates to impede the rights of an existing creditor to collect on a judgment which had been entered against Munim, P.A. twelve days before. Summary judgment based on fraudulent transfer was appropriate.

DE FACTO MERGER AND MERE CONTINUATION OF BUSINESS
Closely intertwined in this case with the concept of fraudulent transfer are the alternative theories of "de facto merger" and "mere continuation of business." While the trial court found Pulmonary Associates liable and granted the motion for summary judgment based on fraudulent transfer of assets from Munim, P.A., it also found from the uncontroverted facts that Pulmonary Associates was a mere continuation of the business of Munim, P.A. and that a de facto merger with Munim, P.A. had occurred. Proof of fraudulent intent is not an integral element of either of these latter two theories. Although the theories are at times referred to interchangeably, the concept of "mere continuation of business" is distinct from the concept of "de facto merger."
A de facto merger occurs where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger. See Arnold Graphics Indus. v. Independent Agent Ctr., 775 F.2d 38 (2d Cir.1985); Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F. Supp. 834 (S.D.N.Y. 1977). To find a de facto merger there must be continuity of the selling corporation evidenced by the same management, personnel, assets and physical location; a *154 continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and assumption of the liabilities. Arnold Graphics, 775 F.2d at 42; Ladjevardian, 431 F. Supp. at 838. All of the events, such as dissolution, need not occur at the same time. Thus, in Knapp v. North Amer. Rockwell Corp., 506 F.2d 361, 367 (3d Cir.1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), a de facto merger was found even though the selling corporation was not dissolved until eighteen months after the sale and possessed valuable assets during the interim.
The imposition of liability upon the successor corporation is grounded upon the notion that no corporation should be permitted to commit a tort or breach a contract and avoid liability through corporate transformations in form only. See Western Resources Life Ins. Co. v. Gerhardt, 553 S.W.2d 783, 786 (Tex.Civ.App. 1977). In the case before us, there is no record evidence to establish that Munim, P.A. was dissolved, although it had essentially ceased operations other than receiving accounts receivable. Therefore, the technical requirement of dissolution of the predecessor corporation was not established.
The concept of continuation of business arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name. Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir.) (en banc), reh'g denied, 765 F.2d 154 (1985). The "purchasing corporation is merely a `new hat' for the seller, with the same or similar entity or ownership." Id. The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation. Id. The change is in form, but not in substance.
The tests for the existence of a de facto merger or a mere continuation of the predecessor's business was adopted by our court in 300 Pine Island Assoc. v. Steven L. Cohen & Assoc., 547 So.2d 255, 256 (Fla. 4th DCA 1989), citing from a footnote in Orlando Light Bulb Serv., Inc. v. Laser Lighting and Elec. Supply, Inc., 523 So.2d 740, 742 n. 1 (Fla. 5th DCA 1988):
A de facto merger occurs when one corporation is absorbed by another, i.e., there is a continuity of the selling corporation evidenced by such things as the same management, personnel, assets, location and stockholders... . "The bottom-line question is whether each entity has run its own race, or whether, there has been a relaystyle passing of the baton from one to the other." (citations omitted.)
Although the words "de facto merger" were used, clearly the standard being applied was primarily that of "mere continuation of business." Applying this standard, we agree that there is no genuine issue of material fact regarding whether the new P.A. is the alter ego or mere continuation of the business of the old P.A. The old P.A. ceased rendering medical services shortly after the judgment was entered against it. The next day the baton was passed to the new P.A. which commenced full operations. It provided the same type of medical services in the same office with the same files, patients, nurses, clerical help, office manager and the same major player, Dr. Munim  the sole stockholder in and president of each P.A.
Dr. Munim's argument against imposition of liability on this basis  that the medical records and patient files lack value or that the patients' relationships are with Dr. Munim personally and not with any corporate employer  does not create a genuine issue of material fact with respect to the continuation of business theory of recovery.[3] For all intents and purposes, the new P.A. is the old P.A. dressed up with a new name and controlled by the same individual. We agree with the trial court that Pulmonary Associates is a mere continuation of the business of Munim, P.A. because it has the "same management, personnel, assets, location and stockholder" as that of Munim, P.A.
*155 When Dr. Munim ceased his medical practice under the corporate entity Munim, P.A. and began practicing the next day under the new name of Pulmonary Associates, the new P.A. took the business of the old P.A.  lock, stock and barrel  or in this case  patients, office and doctor. To argue that the old P.A. is still viable because it continues its collections on its past accounts receivable is to ignore the reality of this professional service corporation whose major business and assets are necessarily the goodwill and patient files and whose primary purpose is to render medical services.
Florida's corporation statutes allow an individual to create a shield against personal liability by forming a professional association. See § 621.05, Fla. Stat. (1993). However, a professional association cannot simply cast off one corporate identity in favor of another in order to evade the effect of a previously existing judgment against the debtor P.A. To take Dr. Munim's argument to its logical conclusion would mean a successor professional service association consisting of an individual could never be the alter ego of the predecessor. A professional would then be able to take advantage of the P.A. to shield him or her from personal liability and subsequently shed the old corporate identity in favor of a new one without concern for the debts of the old P.A. This would lead to an improper interference with collection remedies against professional associations.[4]

CONCLUSION
Accordingly we affirm the judgments of the trial court, except as to the failure to consider an award of damages for the third year of the contract. We remand for the trial court to consider an award of damages to Dr. Azar for the third year of the contract based on the record evidence and also to deduct from the judgment the compensation amount attributed to patient refunds in the first contract year.
AFFIRMED IN PART; REVERSED IN PART.
ANSTEAD and HERSEY, JJ., concur.
NOTES
[1] Dr. Azar concedes that in calculating damages for the first year of the contract, the trial court overlooked $11,152.18 in expenses refunded to patients in the first contract year. These expenses should have been deducted from the gross income. The result of this error was to award Dr. Azar an additional amount of $2,788.05. On remand, the judgment shall be amended to reflect this reduction.
[2] Although Dr. Munim contends that the new P.A.'s medical practice emphasized pulmonary care rather than internal medicine, the facts establish that the shift in emphasis began a year before Pulmonary Associates was formed.
[3] We note that in its verified motion for a temporary injunction, signed by Dr. Munim and filed at the commencement of the lawsuit, Munim, P.A. specifically pled under oath that it (the P.A.) was suffering irreparable harm because Dr. Azar was taking its established patients.
[4] Dr. Munim claims the effect of the trial court's order is a form of personal indentured servitude. We do not agree with this harsh characterization. Nothing in this opinion would prevent a judgment debtor from properly dissolving his professional association in compliance with sections 607.1402-1406, Florida Statutes (1993) and thereafter either retiring from practice or joining another professional association as an employee.